

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS,
# EASTERN DIVISION

| | |
|---|---|
| DAVID EVANS, ) | |
| ) | |
| Petitioner, ) | |
| ) | No. 06 C 259 |
| v. ) | |
| ) | Judge John W. Darrah |
| GUY D. PIERCE, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner, David Evans, filed a Petition for a Writ of Habeas Corpus against Respondent, Guy D. Pierce, the Warden of the Pontiac Correctional Center in Illinois. Petitioner challenges the constitutionality of the state-court conviction and judgment under which he is incarcerated.

## BACKGROUND

Following a jury trial, Petitioner was convicted of two counts of first-degree murder. Petitioner was sentenced to a prison term of natural life.

On May 26, 1994, Alexander Pratt was a customer at a restaurant located on 74th and Halsted Streets in Chicago, Illinois. When the victims, Billy Johnson and Myron Cochran, arrived, Cochran placed an order while Johnson stood near a window. Neither victim was facing the door. Pratt walked toward the door and passed Petitioner, who had just entered with a semi-automatic pistol in his hand. Petitioner shot Cochran in the back of the head, then turned and shot Johnson. Both victims fell to the floor, and Petitioner shot each victim twice more. Pratt ran from the restaurant and observed Petitioner run northbound and enter a four-door Ford, which sped away. Pratt then went to his car and followed the Ford, but the offenders escaped. Pratt returned to the restaurant and called the police.

When the shooting occurred, Police Officer Stanley Sanders, who was off duty, was stopped at a traffic light at 74th and Halsted Streets. He heard gunshots and saw Pratt and Petitioner running from the restaurant. Officer Stanley saw that Petitioner was holding an object under his sweatshirt and fell as he ran toward the Ford, which he ultimately entered. Officer Stanley made a U-turn, memorized the license plate number on the Ford, and unsuccessfully pursued the vehicle. The car belonged to the parents of a co-defendant, Cordell Williams.

At trial, Chicago Police Detective James O'Brien testified that he spoke with Cordell Williams on May 26, 1994. Williams, as well as Officer Sanders, identified Petitioner from an array of photos. On August 15, 1994, Petitioner was arrested in Aurora, Illinois. Pratt and Sanders subsequently identified Petitioner in a lineup as the shooter.

Petitioner presented no witnesses at trial and did not testify at trial. Petitioner's defense counsel, Mary Danahy, tried to establish that another individual, Andre Rudick, was the shooter. To support her theory, Danahy elicited testimony on cross-examination of Detective O'Brien that two years earlier, in 1992, Petitioner made a statement to Detective O'Brien, implicating Rudick in an unrelated crime, and that Detective O'Brien also received information that Rudick was one of the individuals in Williams' car when Johnson and Cochran were murdered.

Before finding Petitioner guilty of both murders, the jury requested a transcript of Pratt's testimony on four occasions. The transcript, however, was unavailable and was not provided to the jury. On March 14, 1996, the jury convicted Petitioner of two counts of first-degree murder.

2

Petitioner appealed to the Illinois Appellate Court, First District, raising two issues: (1) the trial court erred in admitting the grand jury testimony of Robert Jones (a state's witness and Petitioner's cousin through marriage), pursuant to Section 115-10.1 of the Illinois Code of Civil Procedure, without first determining whether his prior testimony was voluntarily given; and (2) the trial court erred in allowing a police officer to testify to a hearsay identification by a non-testifying co-defendant that occurred during the course of the investigation.

Petitioner based his first claim on Jones's August 15, 1994 grand jury testimony in which Jones told the grand jury that he, Petitioner, and Williams were members of the Black Peace Stone street gang and were rivals of the Gangster Disciples street gang. Petitioner told Jones that he shot the victims because he and Williams were shot at by persons he believed were Gangster Disciples. Petitioner was looking for members of the Gangster Disciples when he saw the victims in the restaurant to which Williams had driven. Petitioner suspected they were Gangster Disciples because their cap brims were turned to the right. Petitioner told Jones about the shooting twice, when Jones drove Petitioner to his home in Aurora in June 1994 and a few months later when Larry Lawrence was present. Petitioner bragged about the shooting and told Jones that he used an automatic pistol. Jones did not report the crime because he did not believe Petitioner. The police neither threatened nor made any promises to Jones for testifying before the grand jury.

At trial in March 1996, Jones stated that he was convicted of unlawful use of a weapon in 1990 and unlawful restraint in 1995. Jones further testified that he knew Petitioner for six years. In June 1994, Jones permitted Petitioner to live with him in his home in Aurora. Jones denied that Petitioner told him about the shooting on their ride to Aurora or during a subsequent conversation with Lawrence. Jones also denied that he was a gang member and denied that he knew Petitioner

3

was a gang member or that Petitioner gave the reason why he murdered the victims. Jones also denied that he told the detectives that Petitioner's nickname was "Dai-Dai." Jones testified that the detectives told him to tell the grand jury that Petitioner was in a gang and that Petitioner asked to stay at Jones's house because of the shooting. Jones denied that gang members wear their hats turned to the right to identify their gang. Jones did not remember if Petitioner said what he did after the shooting or if he, Jones, told the grand jurors anyone other than the victims were in the restaurant when the shooting occurred. Jones did not know that the detectives were looking for him or Petitioner and did not know about the shooting or what kind of gun Petitioner used, nor could Jones describe Petitioner's mood when Petitioner talked about the shooting.

Jones further testified at trial that the detectives threatened him and told him how to testify before the grand jury. Jones testified that the detectives told him to tell the grand jury that the Petitioner shot the victims four times. Jones denied that the detectives told him to say that Lawrence was present during a conversation with Petitioner. Jones admitted his grand jury testimony and that he gave this same information to Assistant State's Attorney Kathy Dietz. Jones testified that he was treated well by the Assistant State's Attorney and did not tell her that the detectives threatened him.

On December 1, 1997, the appellate court denied both of the claims and held that the trial court properly admitted the grand jury testimony of Jones because "there is a sufficient evidentiary basis from which a jury could find that [Jones's] prior statements were knowing and voluntary." The appellate court also held that the trial court did not err in admitting the testimony of Detective O'Brien because, pursuant to Illinois law, an officer is allowed to testify as to the course of his investigation.

On June 3, 1998, Petitioner filed a petition for leave to appeal ("PLA") in the Illinois Supreme Court, raising the same issues presented in the Illinois Appellate Court. The PLA was denied on October 6, 1998. In 1999, Petitioner filed a petition for post-conviction relief in the Circuit Court of Cook County. Petitioner alleged in his petition that trial counsel, Danahy, was ineffective for, among other things: (1) failing to contact alibi witnesses John Brown, Tiffany Hartfield, and Shawn Travis and (2) commenting in closing argument on Williams' statement to the police following his arrest. Petitioner also alleged his appellate counsel was ineffective for failing to raise these issues on direct appeal. Petitioner's petition included affidavits from Brown, dated May 3, 1999, and Hartfield, dated May 10, 1999.

Post-conviction counsel was appointed and supplemented Petitioner's *pro se* petition. An evidentiary hearing was held on the post-conviction petition. At the evidentiary hearing, Brown, who had a felony conviction and who had known Petitioner for fifteen years, testified that he was with Petitioner, Hartfield, and Julisa Jones ("J. Jones") at his home at 6201 South Richmond on the night of May 25, 1994. Brown testified he remembered that night clearly because he was celebrating his mother's birthday. Brown's mother died in 1991; and Brown would "have a drink to her" on her birthday, May 27. However, in 1994, he celebrated his mother's birthday on May 25 because a friend was leaving town on May 26. Brown testified Petitioner and Hartfield arrived at his house at approximately 7:30 or 8:00 p.m. Jones was already there, and Brown's fiancee and children were not present. The group drank, played cards, and watched movies past midnight. Brown went to bed at approximately 2:00 a.m., and Petitioner and Hartfield spent the night. After Brown heard rumors that Petitioner was wanted, Brown talked to Petitioner's relatives but was not comfortable going to the police.

Brown also testified he came to court on the first day of Petitioner's trial. Brown, in the presence of Hartfield and Travis, spoke to Petitioner's attorney, Danahy. Danahy told them that she did not want them to testify because their "presence at his trial would hurt him more than it would do him good." Danahy told Brown she was concerned with his criminal background. Brown, Travis, and Hartfield left after Danahy asked them to leave. Brown had not spoken to Danahy before that day.

Brown acknowledged that his 1999 affidavit, submitted in connection with Petitioner's state petition for post-conviction relief, did not include a statement that Jones was at his house on the night of May 25. Brown testified that this was because Jones was "somewhat of a problem with [him] and [his] fiancée" and he did not "want it to mess up [his] home." At the time of trial, Brown lived in 3535 West 63I Place.

Petitioner testified that on the afternoon of May 25, 1994, he was in court on a drug case. Petitioner could remember May 25, 1994, because his pending drug case was "a big deal." Petitioner took the bus to court with Hartfield and stayed there until approximately 4:00 or 4:30 p.m. At approximately 7:00 or 8:00 p.m., Petitioner and Hartfield went to Brown's house. He played cards and video games and watched a movie with Brown, Hartfield, and Jones and became intoxicated. Petitioner and Hartfield did not leave until approximately noon on May 26.

Petitioner further testified that when he was arrested in August, he told the police and a prosecutor that he was at Brown's house on the night of May 25. Petitioner denied telling Detective O'Brien that he was at 69th and Crandon when the murders occurred. Petitioner also denied telling the police that Brown lived near 63rd and California or near 62nd and 63rd and Richmond. Petitioner met Danahy three or four months after he was charged and gave her the names

of Brown and Hartfield. Petitioner also gave Brown's address, date of birth, and place of employment to Danahy. Petitioner denied that he told Danahy that he had ten alibi witnesses or that he refused to give her their names. Petitioner also denied telling Danahy that he took the bus to Brown's house or that Rudick, Brown's girlfriend, and Brown's children were present. Further, Petitioner testified that on the first day of Petitioner's trial, Danahy told him that although Brown and Hartfield were present, she could not call them because "the judge had not been aware in time" and because "the State didn't have a motive and the alibi witness may bring up something that backfire [sic]." Petitioner testified he was not happy with Danahy's representation and that he had tried to hire a private attorney.

Petitioner also testified that he drafted Hartfield's affidavit submitted in connection with his state petition for post-conviction relief. In his previous petition, Petitioner did not draft an affidavit for Hartfield or include her name because Hartfield had moved out of the state. After researching post-conviction law, Petitioner believed that it was useless to include her name if he could not get an affidavit from her.

Hartfield also testified at the hearing. She testified that on the night of May 25, 1994, she was with Petitioner and another girl at Brown's house. Hartfield was 15-years-old at the time and remembered the date because she and Petitioner had sex, and it was "the first time [she] had ever had oral sex." The afternoon of May 25, she rode the bus to court with Petitioner. After court was over, Petitioner rode the bus home with Hartfield and asked her if she wanted to play cards and watch movies that night. Travis drove Petitioner to Hartfield's home at approximately 7:30, picked her up,

7

and dropped Petitioner and Hartfield off at Brown's house. She then played cards and watched two or three movies with Petitioner, Brown, and Brown's girlfriend. Hartfield and Petitioner spent the night and took the bus home the following day.

Hartfield testified that she wanted to tell the police she had been with Petitioner on the night of the murders, but her mother would not let her. Hartfield went to court when Petitioner's trial started but left after Brown and Travis told her Petitioner's attorney thought they might hurt his case. Hartfield did not speak to Petitioner's attorney. Hartfield did not know who prepared her affidavit, but she read it before she signed it. She acknowledged her affidavit did not mention Brown's girlfriend or indicate that she played cards or watched movies.

The parties stipulated that if Detective O'Brien were called, he would testify that when he first interviewed Petitioner on August 15, 1994, Petitioner could not name the friend he was with the night of the murders and said, "He felt the house was at 69th and Crandon." An Assistant State's Attorney was also present at a second interview when Petitioner stated he had been at Brown's house. Petitioner said he believed Brown lived near 63rd and California and then said Brown lived at approximately 62nd or 63rd and Richmond. Petitioner never mentioned Hartfield or Jones.

Petitioner's trial counsel, Danahy, who had been with the public defender's office for 20 years, also testified at the hearing. Danahy was assigned to Petitioner's case in August 1994 and asked Petitioner if there were any witnesses that she could call in his defense. Through June 1995, Petitioner would not give Danahy the names of any witnesses. Although Petitioner did not give her Brown's name, Brown was included in the police report; and Danahy listed him as a potential alibi witness. An investigator tried to locate Brown but was unsuccessful because Danahy did not have Brown's exact address.

On June 23, 1995, Danahy met with Petitioner and again asked him for witnesses' names. Petitioner told Danahy that he had ten alibi witnesses but refused to give her their names or addresses. Within the next month, Petitioner told Danahy that he went to court on the day of the murders but indicated the date was May 26, 1994. Petitioner then took the bus to Brown's house at 6201 South Richmond. Petitioner told Danahy that Rudick, Brown's girlfriend, and Brown's young children were also present. At the time of the conversation, Rudick was in jail for murder. Although Danahy gave this information to an investigator, Brown was not located. Petitioner never mentioned Hartfield or Jones.

On March 6, 1996, approximately five days prior to the start of Petitioner's murder trial, Brown called Danahy. Using her notes from their conversation to refresh her recollection, Danahy testified that Brown told her he then lived at 3535 West 63rd Place and that he had either an unlawful use of a weapon charge or conviction. Brown also told Danahy that Petitioner was at his house on May 27, 1994, with Brown's girlfriend, whose name Brown did not provide, their two children and two other friends. One friend, who Danahy believed to be Rudick, was in prison; and the other was deceased. Brown did not mention Hartfield.

After jury selection on the day of trial, Danahy talked to Brown, who was with a man and a woman in the hallway. Because there was a motion to exclude witnesses, Danahy told Brown, who was listed as a witness, that he could not stay in the courtroom. Danahy did not recall if Hartfield was present.

9

Danahy testified she did not call Brown to testify because she thought there were "some severe problems with his potential testimony," including that Brown had told Danahy he had been with Petitioner on May 27, 1994, two days after the shooting. Additionally, Danahy did not want to place Petitioner with Rudick, whom she believed was involved in the murders.

On cross-examination, Danahy acknowledged her case log did not include the March 6 conversation with Brown. Danahy also acknowledged that her notes of her conversation with Brown only stated "May 27, 1994" and did not state that Brown told her this was the date Petitioner was at his house. Danahy also testified that it was her theory that Rudick was the shooter and that he had framed Petitioner because Petitioner had implicated him in an unrelated case. Further, it would be unlikely that Petitioner would be in a car with Rudick. Danahy believed this defense was stronger than "an alibi witness with the wrong date and some . . . other baggage," including a criminal history. Danahy also testified that she did not recall telling Brown that he had to leave the trial because the judge did not know about him and denied previously telling post-conviction counsel that she may have said this to Brown.

The circuit court ruled that Petitioner had not proved his ineffective assistance of counsel allegations by a preponderance of the evidence and denied his petition. The circuit court found Danahy's testimony to be clear and convincing and concluded that it was a "logical" trial strategy for Danahy not to call Brown to testify because she would not want to associate Petitioner with Brown, who was convicted of a weapons offense. Further, Brown's affidavit did not mention Jones; and the court expressed concern with his testimony as to why he celebrated his mother's birthday on May 25, 1994. The court found persuasive Danahy's testimony that she did not know about Hartfield. However, assuming Danahy did know about Hartfield, the court found that Hartfield's

affidavit omitted Jones, "which [was] material." The court further found that calling Hartfield, a fifteen-year-old who had been having sex, "could have a derogatory effect on a jury." The court additionally found it would be "difficult" for Danahy to investigate witnesses if Petitioner did not provide her with any names. Further, if the names of Petitioner's witnesses were not produced in a timely manner, their testimony could not be memorialized or corroborated; and "attorneys no matter what the defendant says, cannot put on—knowingly put on perjured testimony."

Petitioner appealed the denial of his post-conviction petition to the Illinois Appellate Court, raising his ineffective assistance of trial counsel claim and also arguing that post-conviction counsel was ineffective. On May 27, 2005, the appellate court affirmed the denial of the post-conviction petition. Petitioner additionally sought to file a supplemental, *pro se*, pleading in the appellate court, alleging that the trial court erred in denying post-conviction relief when the evidence presented showed that trial counsel was ineffective. The appellate court denied this motion.

Petitioner then filed a *pro se* PLA from the appellate court's decision, raising two issues: (1) post-conviction counsel rendered unreasonable assistance at the evidentiary hearing held pursuant to the Illinois Post-Conviction Act and (2) Petitioner was improperly prevented from supplementing the post-conviction record with post-conviction counsel's affidavit. The PLA was denied. On January 17, 2006, Petitioner filed the instant federal *habeas* petition.

## ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") has modified the role of the federal court in reviewing state prisoner *habeas* applications to prevent "retrials" and to ensure that state-court convictions are given effect to the extent possible under the law. *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000) (*Williams*). A federal court will not grant *habeas*

*corpus* relief on any claim adjudicated on the merits by a state-court unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

A writ of *habeas corpus* may issue under the "contrary to" clause if the state court applied a rule different from the governing law set forth in the United States Supreme Court's cases or if the state court decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06. The court may issue a writ under the "unreasonable application" clause if the state court correctly identifies the governing legal principle of the United States Supreme Court but unreasonably applies it to the facts of the particular case. *Williams*, 529 U.S. at 407-08. The focus on the latter inquiry is whether the state court's application of clearly established federal law is objectively unreasonable; an unreasonable application is different than an incorrect application. *Williams*, 529 U.S. at 409-11. The burden falls on the petitioner to demonstrate that he is entitled to the relief sought. *See Woods v. Visciotti*, 537 U.S. 19, 25 (2002) (*Visciotti*). Furthermore, there is a presumption that the state court knows and follows the rules of federal constitutional law. *See Visciotti*, 537 U.S. at 24.

A *habeas corpus* petition must survive procedural default before a federal court may address the merits of the petition. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (*Coleman*). Generally, there are two ways a procedural default occurs: (1) where the petitioner fails to raise a federal constitutional issue in the state courts (*Bocian v. Godinez*, 101 F.3d 465, 469 (7th Cir. 1996)); and (2) when a state court rejects a petitioner's claim pursuant to an adequate and

independent state procedural or substantive ground (*Coleman*, 501 U.S. at 729-30).

A petitioner may be excused from a procedural default if he or she can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or a failure to review the claim will result in a fundamental miscarriage of justice. *Schaff v. Snyder*, 190 F.3d 513, 526 (7th Cir. 1999). Cause sufficient to excuse a procedural default is defined as "some objective factor external to the defense" that precludes the petitioner's ability to pursue his or her claims in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (*Murray*). Ordinarily, this requires a showing of some external impediment preventing counsel from constructing or raising the claim. *Murray*, 477 U.S. at 488.

To demonstrate a fundamental miscarriage of justice, the petitioner must show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.' *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (*Schlup*), quoting *Murray*, 477 U.S. at 496. Thus, the petitioner must show "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327.

Petitioner seeks *habeas* relief on the grounds that: (1) his Sixth Amendment right to effective assistance of counsel was violated by his trial counsel's ineffective assistance when counsel failed to call two alibi witnesses; (2) his due process rights were violated by the trial court's error in admitting the grand jury testimony of Jones as substantive evidence without first determining whether the prior testimony was voluntarily given; (3) his due process rights were violated by the trial court's error in allowing a detective to testify as to hearsay identification in the course-of-

investigation testimony; and (4) his Sixth Amendment right to effective assistance of counsel was violated by his trial counsel's ineffective assistance when counsel made remarks regarding Detective O'Brien's testimony during counsel's closing statement.

*Sixth Amendment Violation By Ineffective Assistance of Counsel
Due to Failure to Call Alibi Witnesses*

Petitioner first argues that his Sixth Amendment rights were violated by the ineffective assistance of his trial counsel when she failed to call alibi witnesses on his behalf.

*Strickland v. Washington*, 466 U.S. 668 (1984) (*Strickland*), set forth a two-prong test for reviewing an assertion of ineffective assistance of counsel: first, that counsel's performance was deficient; and, second, that the deficient performance actually prejudiced the petitioner. *Strickland*, 466 U.S. at 687.

To satisfy the first prong of *Strickland*, Petitioner must demonstrate that his counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687. In reviewing challenged conduct, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. To satisfy the prejudice prong of the *Strickland* test, Petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 689.

Ineffective-assistance-of-counsel claims are a mixed question of law and fact reviewable under 28 U.S.C. §2254(d)(1). *Porter v. Gramley*, 112 F.3d 1308, 1313 (7thCir. 1997). Under this standard of review, a federal court will disturb only an unreasonable application of *Strickland* by the state court. Thus, only a clear error in applying *Strickland's* standard will support a writ of *habeas corpus*. *Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir. 1997).

"[I]n reviewing the state trial and appellate courts' adjudication of an ineffective assistance claim, we MUST *presume all factual determinations made by the state courts, including credibility determinations, are correct, unless rebutted by clear and convincing evidence.*" *Murral v. Frank*, 332 F.3d 1102, 1112 (7th Cir. 2003) (*Murral*) (emphasis in original). In that context, *Murral* reaffirmed that "the criterion for assessing the reasonableness of a state court's application of Supreme Court case law, pursuant to § 2254(d)(1), is whether the determination is at least minimally consistent with the facts and circumstances of the case." *Murral*, 332 F.3d at 1112, quoting *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999).

Further, in considering a claim of ineffective assistance of counsel, counsel's performance is viewed deferentially, "with the understanding that there is a great deal of room for disagreement among reasonable attorneys as to the appropriate strategy or tactics to employ in the course of representation." *Woods v McBride*, 430 F.3d 813, 821 (7th Cir. 2005) (*Woods*). A petitioner must show more than that his counsel made poor decisions; he must demonstrate that counsel's performance was so inadequate that the lawyer could not reasonably be said to have functioned as "counsel" in the manner required by the Sixth Amendment. *Woods*, 430 F.3d at 821.

15

Here, Petitioner contends that his trial counsel was ineffective because she failed to call to the stand possible alibi witnesses. Petitioner was given a full evidentiary hearing on this post-conviction claim. The circuit court found that Petitioner had not proven his ineffective-assistance-of-counsel allegations by a preponderance of the evidence and dismissed his claim. The state appellate court conducted a full review and, applying *Strickland,* affirmed the circuit court's denial of Petitioner's post-conviction petition.

The appellate court's decision was neither "contrary to" nor an "unreasonable application" of United States Supreme Court precedent, and the circuit court did not unreasonably determine the facts in light of the evidence at Petitioner's evidentiary hearing. Petitioner did not give Danahy a list of alibi witnesses but merely said there were ten alibi witnesses. Danahy was never given Hartfield's name, so Danahy could not have investigated her potential as a witness or offered her testimony. Danahy's reason for not calling Brown was an appropriate exercise of trial strategy. Brown had previously given Danahy a wrong date (May 27) in a telephone interview and had a weapons conviction in his criminal history – Danahy's opinion that Brown's testimony might hurt Petitioner rather then help him was well founded. Furthermore, Danahy did investigate Petitioner's alibi. Following the investigation, she determined that the alibi would be unhelpful to Petitioner. Under *Strickland,* a counsel's actions are presumed to be considered proper; and Danahy had many reasons for not calling Brown. *Strickland,* 466 U.S. at 699; *see also Bieghler v. McBride,* 389 F.3d 701, 708 (7th Cir. 2004) (failure to call a witness does not show ineffectiveness when based on counsel's view of credibility and trial strategy).

*Due Process Rights Violation By Admission of Robert Jones' Grand Jury Testimony*

Petitioner next argues that his due process rights were violated by the admission of Jones' grand jury testimony because the circuit court failed to first determine whether the prior grand jury testimony was voluntarily given. The Illinois appellate court held that since Petitioner did not raise this issue at trial, the issue was effectively waived for the purposes of review. The state court's ruling that the issue was procedurally forfeited procedurally bars the issue from federal *habeas* review. *See Piscotti v. Washington*, 143 F.3d 296, 300 (7th Cir. 1998). Furthermore, even though the appellate court also analyzed and rejected the claim on the merits, the issue is still procedurally defaulted. *See Harris v. Reed*, 489 U.S. 255, 263-64 (1989).

Even if the claim was not procedurally barred, the claim lacks merit.

When addressing this issue, the appellate court noted that prior inconsistent statements may be admitted as evidence if the statement was made "under oath at a trial, hearing, or other proceeding." 725 ILCS 1 15-10.1(c)(1). Under Illinois law, a witness's claim that a statement was not voluntarily given does not make its admission at trial unconstitutional but creates a mixed question of law and fact. *See People v. Morales*, 281 Ill. App. 3d 695, 703 (1996). Before a trial court can admit a prior inconsistent statement as substantive evidence, it must determine that there was a sufficient evidentiary basis from which a jury could find that the prior statements were knowing and voluntary. *See People v. Johnson*, 255 Ill. App. 3d 547, 559 (1993).

The appellate court noted that Jones's claim that his grand jury testimony was given because he was threatened by police officers was refuted by state witnesses. The appellate court also cited testimony from Jones that he had given the same information to the grand jury that he originally gave to the Assistant State's Attorney and had not complained that he had been threatened by the detective.

The appellate court concluded that there was a reliable basis for the trial court to admit Jones's grand jury testimony and for the jury to make the determination whether his testimony that he was coerced was credible; therefore, there was no due process violation as a result of admitting the testimony into evidence. The appellate court's decision is consistent with federal law and Supreme Court precedent. *See Johnson v. Washington,* 119 F.3d 513, 521 (7th Cir. 1997) (admission of grand jury testimony pursuant to 725 ILCS 5/115-10.1 did not contradict any federal law or unreasonably apply rule from any federal case).

Thus, the admission of Jones's grand jury testimony was not a violation of Petitioner's due process rights.

### *Due Process Violation By Allowing a Detective to Testify as to Hearsay Identification of Petitioner*

Petitioner agues that his due process rights were violated when the trial court wrongly allowed a police detective to testify to the hearsay identification of Petitioner by his non-testifying co-defendant, Williams.

Hearsay is an out-of-court statement offered to prove the truth of an asserted matter. *See People v Pulliam,* 176 Ill. 2d 261, 273 (1997). A statement is not hearsay if the statement is offered for reasons other than the truth of the matter asserted. *See People v. Patterson,* 282 Ill. App. 3d 219, 229 (1996). For example, to establish his course of conduct, an officer may testify that he had a conversation with an individual and then acted on the information he obtained from that conversation. *See People v. Sims,* 285 Ill. App. 3d 598, 609 (1996); *Williams v. Chrans,* 894 F.2d 928, 932 (7th Cir. 1990) (the admission of the police officer's testimony did not violate the confrontation clause).

18

Here, the appellate court found that the testimony in question was not introduced to establish the truth of the witness's out-of-court statements but to establish the course of the detective's investigation. The content of the conversations was not disclosedPetitioner's counsel was also able to cross-examine the detective. As such, the appellate court's finding that the Petitioner's due process rights were not violated by the admission of the detective's testimony was not contrary to or an unreasonable application of clearly established federal law; nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding, and this claim is without merit.

Further, the Petitioner argues that the prosecutor's closing argument prejudiced the jury by improperly referencing this same testimony. Improper prosecutorial remarks do not generally require reversal unless they are so prejudicial as to constitute such a material factor in defendant's conviction that the jury probably would have reached a different verdict had the remarks not been made. *See People v. Falconer*, 282 Ill. App. 3d 785, 789 (1996). The appellate court held that the prosecutor's remarks in closing argument were not prejudicial for a number of reasons: (1) they were properly allowed; (2) they were objected to by defense counsel and sustained by the trial court judge, thus curing any error; (3) the trial court instructed the jury that the closing argument was not evidence; and (4) the overwhelming amount of evidence against the defendant rendered any possible prejudice harmless beyond a reasonable doubt. The appellate court's ruling on this issue is consistent with federal law. *See Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993) (In order to determine whether a constitutional error which occurred during trial was harmless, a reviewing court must assess whether "the error had a substantial and injurious effect or influence on the verdict" which resulted in actual prejudice to the defendant).

*Violation of Sixth Amendment Right to Effective Counsel Due to
Remarks by Petitioner's Counsel During Closing Argument*

Petitioner's final argument is that his Sixth Amendment right to effective counsel was violated by his counsel's remarks regarding Detective O'Brien's testimony during closing argument, which included the substance of Cordell Williams' statement to Detective O'Brien.

Petitioner is required to exhaust all his state remedies regarding a claim before bringing it in a *habeas* petition. 28 U.S.C. § 2254(a). Exhausting all state remedies includes presenting each claim on appeal to the Illinois Appellate Court and in a petition to the Illinois Supreme Court for discretionary review. *See, e.g., O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Hadley v. Holmes*, 341 F.3d 661, 664 (7th Cir. 2003). This rule applies to claims presented in petitions for state post-conviction relief, as well as to claims contained in direct appeals from criminal courts. *See White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999) *(per curiam)*.

Petitioner failed to bring this claim in his direct appeal or in his post-conviction relief appeal. Thus, Petitioner is barred from bringing this claim in the instant petition.

## CONCLUSION

For the foregoing reasons, Evans' Petition for a Writ of Habeas Corpus is denied.

Dated: March 20, 2008

JOHN W. DARRAH
United States District Court Judge

20